UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,         :

        - v -                :         12 Cr. 904 (CM)

ALEXANDER MIKHAILIN,        :

           Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America

Rachel P. Kovner
Assistant United States Attorney
    - Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 3

BACKGROUND ...................................................................................................... 4

      A.    Offense Conduct ..................................................................................... 4

      B.    Issuance of Search Warrant for Mikhailin's Residence............................. 5

ARGUMENT

I.     THERE WAS PROBABLE CAUSE TO SEARCH MIKHAILIN'S RESIDENCE FOR
      INSTRUMENTS, FRUITS, AND INSTRUMENTALITIES OF A CONSPIRACY TO
      VIOLATE THE EXPORT LAWS ……………………………………………………...10

II.    AGENTS ACTED IN GOOD FAITH IN RELYING ON THE SEARCH WARRANT
      FOR MIKHAILIN'S RESIDENCE……………………………………………………...15

III.   THE DEFENDANT'S MOTION PERTAINING TO BRADY AND
      GIGLIO DISCLOSURES SHOULD BE DENIED………………………………………...17

IV.   THE DEFENDANT'S MOTION FOR DISCLOSURE OF EVIDENCE ADMISSIBLE
      UNDER RULE 404(b) SHOULD BE DENIED………………………………………...18

CONCLUSION...…………………………………………………………………………19

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to Alexander Mikhailin's pretrial motion to suppress evidence seized pursuant to a search warrant executed at his residence, in Brooklyn, New York, and for other relief.  Mikhailin contends that the application in support of the search warrant failed to establish probable cause.  In addition, he seeks an order compelling the disclosure of exculpatory, impeachment or mitigation evidence and of materials to be offered at trial pursuant to Federal Rule of Evidence 404(b).

These motions should be denied.  The search warrant contained ample evidence supporting the magistrate judge's determination that probable cause supported a search of Mikhailin's apartment.  Among other things, the 19-page affidavit (1) established that Mikhailin had previously used the apartment to receive export-controlled devices; (2) explained why devices sent to a nearby mailbox facility were likely being transported to Mikhailin's apartment; and (3) set out grounds to believe that documents, records, and electronic evidence related to the conspiracy would be at the apartment, including direct evidence that such documents had been mailed to the apartment; (4) explained that the agent's training and experience also supported a determination that documents and electronic evidence of the conspiracy would be found at Mikhailin's address. In any event, had the affidavit not amply justified the magistrate judge's decision to issue the warrant, suppression would nonetheless be inappropriate, because agents acted in good faith in executing a search based upon the valid warrant.

In addition, the defendant's motions concerning the disclosure of material subject to Federal Rule of Evidence 404(b), and materials discoverable pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963), *United States* v. *Giglio*, 405 U.S. 150 (1972), and their progeny, should be

denied, because the Government recognizes and is complying with its obligations under those cases and rules.

## BACKGROUND

**A.     Offense Conduct**

On December 5, 2012, a grand jury sitting in this district returned a two-count indictment charging Alexander Mikhailin and Yakov Shvartsovskiy with participating in a years-long conspiracy to export sensitive night-vision technology to Russia, in violation of the Arms Export Control Act ("AECA"), and further charging Mikhailin with money laundering.

The Arms Export Control Act authorizes the president to restrict the export of certain "defense articles" when doing so is critical to the national security or foreign policy interests of the United States.  (Indictment ("Ind.") ¶ 1).  Among the items that the President has placed on the controlled list – known as the United States Munitions List – is the most sophisticated class of night-vision technology, which is designed and configured for military use. (*See* Ind. ¶ 3).

Over the course of approximately three years, from 2009 to 2012, Mikhailin – a resident of Brooklyn – participated in a conspiracy to evade that ban by exporting and causing to be exported night-vision technology to Russia, along with Shvartsovskiy, his co-defendant, and a co-conspirator based in Russia ("CC-1").  (*See* Ind. ¶¶ 6-7).  Mikhailin and his conspirators used several different methods to illegally export these devices.  First, from at least 2009 until at least 2011, CC-1, the Russia-based co-conspirator, bought night-vision devices and arranged for the devices to be shipped to Mikhailin in Brooklyn, New York.  (Ind. ¶ 7(a)(i)).  On other occasions, rather than completing the purchases directly, CC-1 sent Mikhailin messages containing

directions about the night-vision devices that CC-1 wanted Mikhailin to purchase.  (Ind. ¶ 7(a)(ii)).

CC-1 and Mikhailin used several methods of paying for the devices that concealed the fact that CC-1, in Russia, was the true purchaser of the export-controlled items. On early occasions, Mikhailin purchased the devices using transfers from his own bank accounts, which occurred on or about the same date that CC-1 transferred a roughly corresponding amount to Mikhailin to fund the purchase.  (Ind. ¶¶ 7(a)(iii)(A), (B), (C)).  On later occasions, CC-1 sent money to Mikhailin via wire transfer. (Ind. ¶ 7(a)(iii)(D)).  Thereafter, beginning in late 2010, CC-1 and Mikhailin appear to have shifted to the less traceable method of large cash payments: During this period, Mikhailin made cash deposits totaling in excess of $70,000 into bank accounts in his name.  (Ind. ¶ 7(a)(iii)(E)).

**B.**     **Issuance of Search Warrant for Mikhailin's Residence**

On December 19, 2012 – two weeks after the grand jury indicted Mikhailin and Shvartsovkiy on the charges described above – Special Agent Scott Hopper of the Federal Bureau of Investigation sought and obtained a search warrant for Mikhailin's residence from a magistrate judge in the Eastern District of New York.  Special Agent Hopper submitted a 19-page affidavit setting forth the basis for his conclusion that there was probable cause that the location would contain evidence, fruits, and instrumentalities of a conspiracy to violate the export laws and related crimes.

The search warrant summarized evidence that Mikhailin had participated for years in a conspiracy to acquire and illegally export night-vision technologies, with his participation continuing until at least the month in which the warrant was executed.   (Affidavit of Special

Agent Scott Hopper ("Hopper Aff.") at 6-9).[1]   The affidavit set out how Mikhailin had begun

the purchase and illegal export of devices years ago – in 2009 – and continued his activities until

the very month in which the affidavit was authored.  In particular, in December 2012, Mikhailin

approached a confidential source to law enforcement agents and asked that the source purchase

night-vision devices for him for export.  (Hopper Aff. at 9).  Mikhailin had explained that money

to fund the purchases would come from overseas and that Mikhailin would either transport the

devices to Russia himself or would arrange for the devices to be transported through flight

attendants. (Hopper Aff. at 9).

       The affidavit also outlined the increasingly sophisticated methods that Mikhailin

and his associates had used over time to conceal their activities.  (Hopper Aff. at 7-8).  Initially,

for instance, CC-1 in Russia had often purchased the export-controlled items himself and had

them shipped to Mikhailin. Over time, however, Mikhailin began to purchase the items, thereby

creating a smoke-screen that he – a U.S.-based person – was the buyer.  (Hopper Aff. at 7).  With

respect to payment, Mikhailin and CC-1 shifted from easily traceable methods – with CC-1

paying for the purchases directly or wiring funds to Mikhailin – to what appeared to be bulk

transfers that obscured the true source of the funds used to purchase night-vision devices.

(Hopper Aff. at 8).

       The affidavit set out substantial evidence that fruits, evidence, and

instrumentalities of the years-long, ongoing conspiracy, would be found at Mikhailin's

apartment.  As an initial matter, the affidavit detailed the numerous ways in which agents had

established that the premises to be searched were both Mikhailin's home and workplace,

---

[1]   The affidavit submitted by Special Agent Hopper in support of a search warrant for
Mikhailin's residence is attached as Exhibit A to the declaration of Mikhailin's attorney, Glenn
Garber, which accompanies the defendant's suppression motion.

including through surveillance, database checks, and review of documents such as bank records

of the accounts used in the scheme, which were being sent to Mikhailin's apartment.  Of

particular note, Mikhailin's home address was the address specified in bank records for the

receipt of bank statements for the accounts that Mikhailin had used in furtherance of the scheme

to pay for the devices being illegally exported and to receive payment from his overseas co-

conspirator.  (Hopper Aff. at 10-11).  In addition, Mikhailin appeared not to have an alternate

address  for business activity.  For instance, he advertised on the website for his tattoo business

that he "works out of his home based shop in the Brighton Beach section of Brooklyn, NY."

(Hopper Aff. at 11).

      The affidavit specified numerous reasons for the agent's belief that the address

used by Mikhailin for both his residence and for work would contain evidence of the conspiracy.

First, the affidavit noted that Mikhailin had previously shipped export-controlled night vision

devices to the residence.  And while Mikhailin had in or about late 2011 begun having the

devices delivered to a nearby mailbox store, Mail Box City Ltd., there was reason to believe the

devices shipped to that store would have then been transferred to the residence. Special Agent

Hopper explained that this particular Mail Box City Ltd. location was close to Mikhailin's home,

and that it was his understanding that the store would only keep items for customers for a limited

period of time.  (Hopper Aff. at 7-8).  Thus, the agent concluded that this shift appeared to be

one of a number of moves designed to mask the conspiracy's operation, and that items sent to

Mikhailin at that address were likely picked up and transported to" Mikhailin's nearby

apartment. (Hopper Aff. at 7-8).

      With respect to documents,  Special Agent Hopper noted that Mikhailin's

apartment was the address specified in bank records for the receipt of bank statements for

accounts that Mikhailin used in furtherance of the conspiracy, both to pay for devices being illegally exported and to receive payment from his overseas co-conspirator.  (Hopper Aff. at 10-11).

Next, Special Agent Hopper noted that his training and experience (bolstered by evidence developed through search warrants in this investigation) provided further reason to conclude that there would be documentary and electronic evidence at Mikhailin's address.  Not only had bank records providing evidence of the conspiracy apparently been delivered to Mikhailin's address, but in Special Agent Hopper's training and experience, "[i]ndividuals engaged in illegal businesses such as the illegal export business described above commonly maintain books, records, receipts, notes, ledgers, money orders, bank records, currency, safe deposit box keys, photographs, and other papers and records relating to the transportation, storage, order, sale and distribution of the illegal items being sold."  (Hopper Aff. at 12).

Similarly, Special Agent Hopper noted that in his training and experience, computer hardware, software, documentation, passwords, data security devices, and data may be integral tools of conspiracies to purchase and sell export-controlled items and similar businesses involving the purchase and sale of illegal items and may constitute the means of committing these and other crimes." (Hopper Aff. at 12-15).  This was particularly likely here, where e-mail search warrants had revealed that Mikhailin used e-mail as part of the illegal scheme, including to communicate with CC-1 regarding the controlled product to be purchased for illegal export. (Hopper Aff. at 15).  Special Agent Hopper also noted that, in his training and experience, e-mail accounts used in conspiracies to sell contraband are often accessed using computers and other electronic devices kept at conspirators' places of residence – a likelihood heightened in this case because Mikhailin appeared to have no place of business other than his residence.

After setting forth the facts supporting probable cause, the affidavit squarely put before the magistrate and confronted the argument made by Mikhailin in this Court, that there was not probable cause because the FBI had not obtained recent, direct evidence of Mikhailin shipping export-controlled devices to his apartment.  (See Hopper Aff. at 14).  Special Agent Hopper noted that Mikhailin's recent approach to a potential straw buyer provided evidence that the absence of recent shipments directly to Mikhailin's home "reflects not a termination of the conspiracy but rather a shift to more sophisticated methods of avoiding detection, such as the use of straw buyers."  (Hopper Aff. at 14).  In addition, Special Agent Hopper noted that, based on his training and experience, "while individuals involved in the sale of contraband may not maintain the contraband itself at their premises for a lengthy period of time, those individuals will often keep records of their business for an extended period."  (Hopper Aff. at 14).  Here, "[b]ecause the PREMISES are Mikhailin's place of residence and the place to which his financial statements appear to be sent, and because MIKHAILIN does not appear to have another place of business, I submit that there is probable cause to believe that documentary and other evidence of the TARGET OFFENSES is located at the PREMISES." (Hopper Aff. at 14).

The Hon. Robert M. Levy, a magistrate judge in the Eastern District of New York, granted the warrant for the search of Mikhailin's apartment on December 19, 2012. Agents executed the search the following day, recovering substantial additional evidence of Mikhailin's participation in the conspiracy to illegally export controlled technology.  For instance, agents recovered a quick-reference guide to a particular export-controlled night-vision device that had recently been purchased by CC-1; a note containing the address and telephone number of a hotel that had previously been used by co-conspirator Yakov Shvartsovskiy to transfer export-controlled devices to a flight attendant for transport to Russia; documents

reflecting the shipment of night-vision devices to the mailbox store near Mikhailin's home; and Western Union transfer receipts that appeared to document the transfer of funds from CC-1 to Mikhailin.

## ARGUMENT

**II.    THERE WAS PROBABLE CAUSE TO SEARCH MIKHAILIN'S RESIDENCE FOR INSTRUMENTS, FRUITS, AND INSTRUMENTALITIES OF A CONSPIRACY TO VIOLATE EXPORT LAWS.**

### A.    Applicable Law

The task of a judge reviewing an application for a search warrant is to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois* v. *Gates*, 462 U.S. 213, 238 (1983). "[P]robable cause is a flexible, common-sense standard." *Texas* v. *Brown*, 460 U.S. 730, 742 (1983). The evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Gates*, 462 U.S. at 231-32 (internal quotation marks omitted); *see also United States* v. *Travisano*, 724 F.2d 341, 346 (2d Cir. 1983) ("it is only a probability, and not a prima facie showing of criminal activity, that is the standard"). A "showing of a sufficient nexus between the alleged criminal activities and the premises to be searched 'does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience.'" *United States* v. *Morgan*, 690 F. Supp. 2d 274, 284 (S.D.N.Y. 2010) (quoting *United States* v. *Singh*, 390 F.3d 168, 182 (2d Cir. 2004)).

A judge's determination that probable cause exists "should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236. Indeed, a magistrate's finding that probable cause exists "is itself a substantial factor tending to uphold the validity of the warrant." *Travisano*, 724 F.2d at 345. Accordingly, the role of a reviewing court is simply to ensure that

the issuing judge had a "substantial basis" for concluding that probable cause existed.  *Gates*, 462 U.S. at 236; *see also Walczyk* v. *Rio*, 496 F.3d 139, 157 (2d Cir. 2007).  Any doubt should be resolved in favor of upholding the warrant.  *E.g.*, *United States* v. *Ornelas*, 517 U.S. 690, 699 (1996).

   With regard to the recency of the information supporting the probable cause determination, "the principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law." *United States* v. *Gallo*, 863 F.2d 185, 192 (2d Cir. 1988).  Where a supporting affidavit presents "a picture of continuing conduct or an ongoing activity, as contrasted with isolated instances of illegal acts, the passage of time between the last described act and the presentation of the application becomes less significant." *Id.*  The link between the location to be searched and recent criminal activity may be a circumstantial one:  "[E]stablishing a sufficient nexus between the alleged criminal activities and the premises to be searched 'does not require direct evidence and may [instead] be based on reasonable inference from the facts presented based on common sense and experience.'" *United States* v. *Gayle*, 08 Cr. 1244, 2009 WL 4667093, at *2 (S.D.N.Y. Dec. 8, 2009) (Sweet, J.) (citing *Singh*, 390 F.3d at 182).

   Moreover, courts have recognized that documentary evidence, such as financial records, is "not temporary in nature or likely to dissipate over time." *Id.*  On the contrary, "[u]nlike drugs or cash, records of past activity are likely to be maintained over time, especially if the activity involved" substantial dollar amounts over several years. *United States* v. *LaMorte*, 744 F.Supp. 573, 576 (S.D.N.Y. 1990).

   In assessing probable cause, a law enforcement agent's opinion based upon training and experience "is an important factor to be considered by the judge when making a

probable cause determination." *United States* v. *Benevento*, 836 F.2d 60, 71 (2d Cir. 1987)

(internal quotation marks omitted) (abrogated on other grounds).  In assessing whether

contraband is likely to be found at a conspirator's home, an issuing judge is entitled to rely both

on an agent's expert opinion and on the commonsense notion that an individual may have

evidence of that conspiracy located in his residence.  *See United States* v. *Fama*, 758 F.2d 834,

838 (2d Cir. 1985) (approving of reliance on agent's expert opinion that narcotics traffickers

"frequently maintain at their homes large amounts of cash, drugs, books, ledgers and other

documents evidencing their criminal activities"); *United States* v. *Morgan*, 690 F. Supp. 2d 274,

286-87 (S.D.N.Y. 2010); *United States* v. *Brown*, 676 F. Supp. 2d 220, 228 (S.D.N.Y. 2009).

### B.    Discussion

The 19-page affidavit submitted to the magistrate judge in this case amply

justified the judge's determination that there was a fair probability that contraband or evidence of

a crime would be found at Mikhailin's residence.  The affidavit both described Mikhailin's role

at the heart of a conspiracy to export sensitive military technology to Russia from at least 2009

through December 2012, the month in which the search was executed, and set forth numerous

reasons to infer that evidence of this conspiracy would be found at Mikhailin's residence.  With

respect to the premises being searched, the affidavit detailed abundant circumstantial evidence

that Mikhailin used his residence to store materials related to the conspiracy.  When Mikhailin

discontinued the shipment of packages directly to his residence, he simply had them delivered in

the first instance to a mailbox store nearby.  The affidavit offered three reasons for Special Agent

Hopper's conclusion that such packages were likely then transported to the apartment that

Mikhailin had previously used in furtherance of the conspiracy: (1) the location of the mailbox

store was close to Mikhailin's apartment; (2) Special Agent Hopper understood the mailbox

facility would store items only for a brief period; and (3) Mikhailin did not appear to have another address where the items could be stored.  (Hopper Aff. at 8).[2]  While it is certainly *possible* that Mikhailin had an undiscovered, additional location to which he transported the devices from the mailbox store, Judge Levy was certainly entitled to conclude that there was a "fair probability" that the devices delivered to the mailbox store were transported to Mikhailin's sole known home or work address, rather than some hitherto-undiscovered alternate address.[3]

Second, the affidavit set forth substantial direct evidence indicating that records of the conspiracy would be found at the residence. Special Agent Hopper noted that bank documents obtained via subpoena established that Mikhailin had *sent to his apartment* critical financial records that constituted evidence of the export conspiracy. (*See* Hopper Aff. at 10-11; *see also* Hopper Aff. at 14 ("Because the PREMISES are Mikhailin's place of residence and the place to which his financial statements appear to be sent, and because MIKHAILIN does not appear to have another place of business, I submit that there is probable cause to believe that documentary and other evidence of the TARGET OFFENSES is located at the PREMISES")). Special Agent Hopper further noted that, in his training and experience, "[i]ndividuals engaged in illegal businesses such as the illegal export business described above commonly maintain books, records, receipts, notes, ledgers, money orders, bank records, currency, safe deposit box

---

[2]  Mikhailin's motion simply does not address the reasons offered in the affidavit as the basis for the agent's conclusion that devices sent to the mailbox location were likely then transported to Mikhailin's residence. (*See* Def't Br. at 5 (stating that "[t]he affidavit speculates, without any apparent factual basis, that items sent to Mikhailin at Mail Box City Ltd. 'were likely picked up and transported to' Mikhailin's residence")).

[3]  Similarly, it would also have been reasonable to infer that the devices that Mikhailin was attempting to acquire through straw purchasers – including during the month of the search – would be transported to his home, in light of Mikhailin's prior use of those premises in connection with the criminal activity and the absence of any other location to which Mikhailin was known to conduct business.

keys, photographs, and other papers and records relating to the transportation, storage, order, sale and distribution of the illegal items being sold." (Hopper Aff. at 12).   Courts have long treated direct evidence of inculpatory financial records being sent to a home address, coupled with an agent's expertise suggesting records are commonly retained at home, as significant support for a probable-cause determination.  *See, e.g., United States* v. *Bowen*, 689 F. Supp. 2d 675, 679-680 (S.D.N.Y. 2010).  Rather than grappling with this evidence, Mikhailin simply omits any mention of the fact that this critical financial evidence had been sent to the apartment at issue.  (*See*  Def't Br. at 5-6 (disputing Special Agent Hopper's statements regarding his experience with maintenance of records and documents as too general and contending that "no particularized information is set forth with regard to this individual defendant, nor even the particular 'illegal business[]' in which he was engaged")).

Similarly, Special Agent Hopper's training and the evidence developed in the FBI's investigation provided a basis to believe that electronic evidence would be found at the apartment.  Not only did Special Agent Hooper note that, in his training and experience, computer hardware, software, data security devices, and similar electronic media containing evidence were commonly maintained and located at the homes of conspirators, but he observed that that likelihood of finding such devices was heightened in this investigation because prior search warrants had revealed that Mikhailin used e-mail to correspond with his co-conspirators about their illegal activities, and because Mikhailin appeared to have no place of business to maintain electronic evidence other than his residence.  *Cf. Bowen*, 689 F. Supp. 2d at 680 (noting among facts supporting probable cause that the defendant had used what appeared to be a personal e-mail address to conduct the fraud offense at issue and agent's expert opinion that

individuals engaged in conspiracies of the type at issue in that case often kept documents at home).

In sum, in light of the evidence concerning Mikhailin's prior use of his home in furtherance of the conspiracy, the evidence suggesting Mikhailin's continued use of the home for such purposes, the direct evidence of Mikhailin's use of the home to receive documents providing evidence of the conspiracy, and the support provided by Special Agent's training and experience regarding the storage of financial, electronic, and similar evidence, the magistrate judge was amply justified in finding a fair probability that evidence, fruits, and instrumentalities of the export conspiracy and related offenses would be found at Mikhailin's apartment.

## II.   AGENTS ACTED IN GOOD FAITH IN RELYING ON THE SEARCH WARRANT FOR MIKHAILIN'S RESIDENCE.

### A.   <u>Applicable Law</u>

It is well-settled that, as a general matter, where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant," the Fourth Amendment exclusionary rule does not apply. *United States* v. *Leon*, 468 U.S. 897, 922 (1984). The Supreme Court has held that the "marginal or nonexistent benefits produced by suppressing evidence obtained in  objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.*; *see also Herring* v. *United States*, 555 U.S. 135 (2009).  "The essential rationale underlying [this] good faith exception is that the exclusionary rule 'cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.'" *United States* v. *Cancelmo*, 64 F.3d 804, 807 (2d Cir. 1995) (quoting *Leon*, 468 U.S. at 919).  The pivotal question in a particular case is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23; *see also United States* v. *Moore*, 968

F.2d 216, 222 (2d Cir. 1992).  If the reviewing court finds that the officers' reliance on the

warrant was objectively reasonable, suppression is not warranted.  *See, e.g.*, *United States* v.

*Roberts*, 852 F.2d 671, 675 (2d Cir. 1988).

       Applying this principle, courts have determined that the good-faith exception does

not permit admission of a search's fruits only when: (1) the issuing judge was deliberately or

recklessly misled by information the affiant knew was false; (2) the issuing judge wholly

abandoned his or her judicial role; (3) the supporting affidavit lacked any indicia of probable

cause; or (4) the warrant was "so facially deficient – i.e., in failing to particularize the place to be

searched or the things to be seized – that the executing officers cannot possibly presume it to be

valid."  *See* Leon, 468 U.S. at 923.

**B.  Discussion**

       Even if Mikhailin's challenge to the magistrate judge's probable cause

determination had merit — and it does not — suppression of the fruits of that search would be

unwarranted, because the officers executing that warrant acted reasonably and in good faith.

Mikhailin does not contend that the magistrate judge was misled concerning the investigation or

that the judge had wholly abandoned his judicial role.  And it cannot be said that the 19-page

affidavit submitted in support of the warrant application lacked any indicia of probable cause or

was a facially deficient, bare-bones submission.  *See United States* v. *Moore*, 968 F.2d 216, 222

(2d Cir. 1992) (upholding application of good faith exception because "the warrant application

presented to [the judge] was not a bare bones affidavit, but rather contained many objective

facts").  Accordingly, even had the affidavit been flawed, suppression of the evidence obtained

from Mikhailin's home would not be warranted.

III.    **THE DEFENDANT'S MOTION PERTAINING TO *BRADY* AND *GIGLIO* DISCLOSURES SHOULD BE DENIED.**

The Court should likewise deny Mikhailin's motion for an order directing the Government to disclose exculpatory material and impeachment materials, pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963), *United States* v. *Giglio*, 405 U.S. 150 (1972), and related cases. No such order is necessary here.  With respect to *Brady*, the Government recognizes its obligations and has repeatedly acknowledged them in correspondence with defense counsel. Should the Government become aware of *Brady* material, it will promptly produce it.  As a result, the defendant's request for an order pertaining to the disclosure of *Brady* material should be denied, consistent with common practice in such circumstances.  *See, e.g., United States* v. *Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of *Brady* material based on Government's representations that "it is aware of its obligations under *Brady* . . . and will produce any *Brady* material to the defense well before trial"); *United States* v. *Yu*, No. 97 Cr. 102 (SJ), 1998 WL 57079, at *4-5 (E.D.N.Y. Feb. 5, 1998) (denying defense request that Government provide early disclosure of *Brady* material because Government acknowledged its continuing obligation to provide exculpatory material upon its discovery and assured that it would comply with that obligation); *United States* v. *Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

With respect to *Giglio* materials, the Government is likewise aware of its obligations and expects to provide all impeachment material concerning its witnesses simultaneous with Jencks Act material, at least one day before the witness testifies.  This timetable is consistent with the general practice in this district.  *See, e.g., United States* v. *Trippe*, 171 F. Supp. 2d 230, 237 (S.D.N.Y. 2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time

17

as Jencks Act material, that is, at least one day before the Government witness is called to testify"); *United States* v. *Rueb*, 00 Cr. 91, 2001 WL 96177(RWS), at *6-7 (S.D.N.Y. Feb. 5, 2001) (Government directed to provide *Giglio* material at least one day before calling the relevant witness to testify). As the cases recognize, such disclosure allows defense counsel adequate time to prepare for cross-examination of Government witnesses as they are called to testify. The Second Circuit has rejected the defendant's suggestion that impeachment material of potential trial witnesses should be disclosed when defendants make a demand for it. *See United States* v. *Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). Such a time-table would pose practical and prudential difficulties, in any event, because the Government has not yet fully determined which witnesses it will call at trial.

## IV.   THE DEFENDANT'S MOTION FOR DISCLOSURE OF EVIDENCE ADMISSIBLE UNDER RULE 404(b) SHOULD BE DENIED

The defendant's motion for an order mandating the disclosure of evidence to be offered pursuant to Rule 404(b) is similarly superfluous. Rule 404(b) requires that the Government provide notice of its intent to use evidence of other crimes, wrongs, or bad acts. Fed. R. Evid. 404(b). As the defendant's submission acknowledges, however, rather than set a specific time-line for such notifications, the Rule requires that the Government provide "*reasonable* notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown" of its intent to use such evidence. Fed. R. Evid. 404(b) (emphasis added); *see also United States* v. *Matos-Peralta*, 691 F. Supp. 780, 790 (S.D.N.Y. 1988) ("Rule 404(b), however, sets no minimum time for action by the government in this request, nor would any time limit be appropriate, since the evidence the government wishes to offer may well change as the proof and possible defenses crystallize"); *United States* v. *Allums*, 97 Cr. 267 (HS), 1997 WL 599562, *1 (S.D.N.Y. Sept. 25, 1997) ("The Government has agreed to produce this material in time so that

18

the defense may have an opportunity to challenge [its] admission; this is all that is required with respect to Rule 404(b) evidence.").  The Government has not yet determined what 404(b) evidence it may seek to introduce at trial, but will disclose the substance of prior bad acts in a timely fashion as it assembles its trial proof, in order to permit the defendant an opportunity to challenge admission of those acts, if any, and to permit the Court to make an appropriate finding. *See* Fed. R. Evid. 404(b); *United States* v. *Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996).  There is therefore no need for an order mandating Rule 404(b) disclosures in advance of trial.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's pretrial motions in their entirety.

Dated:        New York, New York
              August 2, 2013

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

              By:    _____/s/_____
                     Rachel Kovner
                     Assistant United States Attorney
                     (212) 637-2470

## CERTIFICATE OF SERVICE

I, Rachel Kovner, Assistant United States Attorney for the Southern District of New York, hereby certify that on August 2, 2013, I caused a copy of the Government's Memorandum of Law in Opposition to Defendant's Pretrial Motions to be filed on ECF and thereby to be delivered by electronic mail to:

> Glenn A. Garber
> 233 Broadway, Suite 2370
> New York, NY 10279

Dated:      New York, New York
            August 2, 2013

_____/s/_____
Rachel P. Kovner
Assistant United States Attorney
(212) 637-2470